IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED      ENTERED
LODGED      RECEIVED

MAY 0 2 2002

AT BALTIMORE
CLERK U.S. DISTRICT COURT,
DISTRICT OF MARYLAND

BY                    DEPUTY

BURNS & RUSSELL CO. of          :
BALTIMORE, et al.,              :
   Plaintiffs                   :
                   :
     v.                        :   CIV. NO. AMD 00-3019
                   :
OLDCASTLE, INC., et al.,        :
   Defendants                   :

...o0o...

## MEMORANDUM

This action arises out of a business dispute in the glazed concrete block industry. Plaintiffs, the Burns & Russell Company of Baltimore and Southeast Capital Corporation (collectively "the plaintiffs" or "Burns & Russell"), brought state law breach of contract claims and federal and state statutory claims against a host of defendants, including the remaining defendants, Oldcastle, Incorporated (hereinafter "OI") and Oldcastle Precast, Inc. (hereinafter "OPI"). Plaintiffs filed the case on October 5, 2000, but withheld service of process on defendants until the eve of the deadline imposed by Fed. R. Civ. P. 4(m). On October 15, 2001, after full briefing, I granted the following motions filed by one or more defendants: (1) motion to dismiss for delinquent service of process; (2) motion to dismiss for lack of capacity to be sued; and (3) motion to dismiss for lack of personal jurisdiction. I reserved judgment on OI's motion to dismiss for lack of personal jurisdiction and OI's and OPI's motions to dismiss for failure to state a claim, pending discovery on jurisdictional



issues and supplemental briefing.[1]

Jurisdictional discovery and supplemental briefing are now complete. Before the court is OI's renewed motion to dismiss for lack of personal jurisdiction and the Fed. R. Civ. P. 12(b)(6) motions as to OI and OPI. I have given careful attention to the parties' memoranda and exhibits, and an oral hearing is not needed. For the reasons explained below, I shall grant the motions to dismiss.

(i)

Plaintiff Burns & Russell is a Pennsylvania corporation with its principal place of business in Baltimore. Plaintiff Southeast is a Maryland corporation. Defendant OI is a holding company, incorporated in Delaware, with its principal place of business in Georgia. A complete recitation of the facts concerning the alleged dispute between plaintiffs and OI and its affiliates and subsidiaries is contained in my earlier opinion. *See Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*, 166 F.Supp.2d 432 (D.Md. 2001).

(ii)

I have not conducted an evidentiary hearing; accordingly, at this stage, plaintiffs need not establish personal jurisdiction over OI by a preponderance of the evidence. *See Choice Hotels, Int'l, Inc. v. Madison Three, Inc.*, 23 F.Supp.2d 617, 619 & n. 1 (D.Md. 1998) (citing

---

[1]After I filed my October 15, 2001, Order dismissing all defendants except OI and OPI, plaintiffs filed a second case on October 19, 2001, in the Circuit Court for Baltimore City, which was timely removed to this court on November 16, 2001. *See* No. AMD 01-3404. The second case asserts eighteen causes of action against eight defendants. Now pending in the second case are various motions to dismiss.

*Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993) and *Blue Ridge Bank v. Veribanc, Inc.*, 755 F.2d 371, 373 (4th Cir.1985)). Nevertheless, as I have allowed plaintiffs to conduct extensive jurisdictional discovery, plaintiff must do more than merely establish personal jurisdiction by the *prima facie* standard. Rather, plaintiffs must overcome, by substantial evidence based on the discovery that was permitted, OI's compelling showing that it lacks the requisite minimum contacts with Maryland to justify the court's exercise of personal jurisdiction over the defendant. *See Boit v. Gar-Tec Products, Inc.,* 967 F.2d 671, 676-78 (1st Cir.1992); *Bell v. Fischer*, 887 F.Supp. 1269, 1275-76 & n.4 (N.D. Iowa 1995).

### (iii)

The time-honored two-step inquiry-- statutory and constitutional-- into the propriety of subjecting a non-resident defendant to the jurisdiction of a forum court is "well-established." *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory",* 283 F.3d 208, 212-13 (4th Cir. 2002). Maryland appellate courts and the United States Court of Appeals for the Fourth Circuit "have shown a willingness to collapse [the long-arm and constitutional] inquiries into a single analysis, since the Maryland Long-Arm Statute is to be interpreted as extending to constitutional limits." *Choice Hotels*, 23 F.Supp.2d at 619 (citing Maryland and Fourth Circuit personal jurisdiction precedent); *id.*[2] In assessing the

---

[2]The provisions of Maryland's Long-Arm statute relevant here provide: "In general.--A court may exercise personal jurisdiction over a person, who directly or by an agent ... [t]ransacts any business or performs any character of work or service in the State ...; [c]ontracts to supply goods, food, services, or manufactured products in the State; ... [or] [h]as an interest in, uses, or
(continued...)

sufficiency of a non-resident defendant's contacts with the forum state, the "constitutional touchstone" is whether the contacts were "purposefully established" by the defendant such that he "will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985) (citations omitted).

The Supreme Court has drawn a distinction between "specific" jurisdiction and "general" jurisdiction. General jurisdiction permits a court to subject a non-resident defendant to suit in the forum as to claims wholly unrelated to any contact the non-resident has with the forum; it exists only where the foreign defendant's in-state activities amount to "continuous and systematic" contact with the state. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 416 (1984). The level of "minimum contacts" necessary to confer general jurisdiction is substantially higher than that required for specific jurisdiction, *Atlantech Distribution, Inc. v. Credit General Ins. Co.*, 30 F.Supp.2d 534 (D.Md.1998) (citing *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir.1997), *cert. denied*, 523 U.S. 1048 (1998)), and "[b]road constructions of general jurisdiction [are] generally disfavored." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir.1993).

A court has specific jurisdiction over a defendant when a cause of action arises out of the defendant's contacts with the forum. *Helicopteros*, 466 U.S. 408 at 414. A "tri-partite"

---

[2](...continued)
possesses real property in the State . . . ." Md.Code Ann., Cts. & Jud. Proc. § 6-103(b)(1).

showing is required to establish specific jurisdiction: (1) "the nonforum defendant purposely

directed its activities toward residents of the forum state or purposely availed itself of the

privilege of conducting activities therein; (2) plaintiff's cause of action arises out of or results

from the defendant's forum-related contacts; and (3) the forum's exercise of personal

jurisdiction in the case is reasonable, i.e., is consistent with 'fair play and substantial

justice.'" *Cape v. Von Maur*, 932 F.Supp. 124, 126 (D.Md. 1996)(quoting *Burger King

Corp.*, 471 U.S. at 477-78).

*    *    *    *    *    *

As elaborated below, plaintiffs have cobbled together a raft of alleged "facts," and

have urged me to draw "inferences" from such "facts," to conclude that OI, either directly or

as a result of the acts and omissions of persons who have not been shown to have acted with

authority granted by OI, has generated minimum contacts with Maryland and/or has

purposefully availed itself of the benefits of Maryland law. These alleged contacts, however,

are insufficient to demonstrate the existence of jurisdiction over OI (or are, indeed, irrelevant

to the question altogether), largely because, *inter alia*, plaintiffs have failed to establish that

the contacts were in fact contacts by OI. I shall discuss in turn each of plaintiffs' assertions

regarding OI's alleged contacts.

*General Jurisdiction*

Plaintiffs plainly fail to establish sufficient contacts by OI with the state of Maryland

to form a basis for this court's assertion of general jurisdiction.  The evidence clearly

establishes that OI is a holding company, headquartered in Atlanta, lacking "continuous and systemic" contacts business contacts with the state of Maryland. OI's business is limited to monitoring activities typically performed by parent holding companies for their subsidiaries–preparing tax returns, ensuring compliance with foreign financial reporting requirements, and overseeing external auditing services. *Pls.' Supplemental Mem. on Outstanding Jurisdictional Issues* ("*Pls.' Supplemental Mem.*"), Ex. C (Oldcastle, Inc.'s Responses to Pls.' Interr.). OI employs a total of seventeen people, all of whom work in Atlanta. *Gary Hickman, Vice President of Tax, Oldcastle, Inc., Dep.* ("*Hickman Dep.*"), 16-17. Moreover, OI does not manufacture, sell, distribute or take orders for products and services of its subsidiaries, nor is OI registered or licenced to do business in Maryland. *McCullough Dep.*, 49; *Hickman Dep.* ¶ 5.

## Lowe's and Home Depot Agreements

Plaintiffs maintain that OI entered into two agreements, the Lowe's Agreement and the Home Depot Agreement, to sell its goods throughout Maryland. Plaintiffs rely on the February 18, 2002, affidavit by Robin Phillips ("Phillips"), the Merchandise Manager of Lowe's, for support of the alleged OI-Lowe business relationship. In her February 18, 2002, affidavit, Phillips maintains:

(1) Oldcastle, Inc., entered into a Master Standard Buying Agreement with Lowe's on October 24, 1997, which was signed by Mark Schmidt on behalf of Oldcastle, Inc.;

-6-

(2) Oldcastle, Inc., provided Lowe's with an information sheet stating that its mailing address in Maryland is 2630 Crofton, Maryland 2114;

(3) Oldcastle, Inc., provided Lowe's with a Maryland fax number and post office box;

(4) Oldcastle, Inc., maintains and provides its own displays at Lowe's stores located in Maryland;

(5) Lowe's stores request products directly from Oldcastle, Inc.;

(6) Oldcastle, Inc.'s products are sold at all 16 Lowe's stores in Maryland; and

(7) Oldcastle, Inc., provided Lowes with a Vendor Information sheet listing a post office box in Maryland.

*Phillips Aff.* ¶¶ 1-7.

Phillips's averments regarding OI, however, are plainly incorrect. OI does not conduct business with Lowe's. Rather, APG National, Inc., a subsidiary of OI, conducts business with Lowe's. *February 26, 2002 Affidavit of Peter J. Kiley,* ¶ 4 ("*Kiley Affidavit*"). According to Peter J. Kiley ("Kiley"), the President of APG Homecenter, a division of APG National, Inc., Lowe's conducts business with APG National, Inc., through APG Homecenter.[3] Part of this business relationship entails APG Homecenter manufacturing and distributing concrete products to retail stores such as Lowe's. *Id.* at ¶ 2. Kiley explained that

---

[3]Throughout the parties' memoranda, "Homecenter Group" is occasionally referred to as "Home Centers" and "Home Center Group." For the purposes of this opinion, I assume that three entities are synonymous.

at the time of the execution of the Lowe's Agreement, APG Homecenter was a division of

Oldcastle Architectural, Inc. According to Kiley, at some point, APG Homecenter became

a division of Oldcastle APG National, Inc., and in January 2000, Oldcastle APG National,

Inc., assumed responsibility for the Lowe's Agreement. *Id.* at ¶ 3. Kiley attests that

Schmidt incorrectly referenced "Oldcastle, Inc." as the corporate entity that was a party to

the contract, instead of "Oldcastle Architectural, Inc." *Id.*

Other testimony buttresses Kiley's affidavit. The President of Oldcastle Architectural

Products Group, Joseph McCullough,[4] testified that Schmidt was not an employee of OI and

that he was specifically told not to sign documents for OI, as Schmidt was in fact President

of APG Homecenter Group. *Joseph McCullough Dep.*, 135 (hereafter "*McCullough Dep.*").

Gary Hickman ("Hickman"), Vice President of Tax for OI, averred that OI is not now and

has never been involved in performing Oldcastle Homecenter Group's obligations under the

Lowe's Agreement. *Third Hickman Aff.* ¶¶ 3-8. OI does not take orders for products or

services from Lowe's retail stores in the state of Maryland, *Third Hickman Aff.* ¶ 4; does not

handle complaints from customers who purchase products with the Oldcastle trade name, *id.*

at ¶ 5; and does not provide or maintain displays of products with the Oldcastle trade name

at any retail stores in the state of Maryland. *Id.* at ¶ 8.

Indeed, in a second affidavit dated February 27, 2002, Phillips concedes that, aside

---

[4]It appears that McCullough was also the President of Oldcastle Architectural, Inc., until
recently. *Hickman Dep.* at 85; *McCullough Dep.*, 70.

from the single reference to OI on the last page of the Lowe's Agreement, she has no independent knowledge of any business relationship between Lowe's and OI. *Phillips' Second Aff.* ¶ 5. Phillips has never dealt with employees or representatives of OI; rather, Phillips has interacted only with employees of "APG Home Centers" with respect to the Lowe's Agreement. *Id.* ¶¶ 2, 3.

Other documents in the record confirm that OI is not the corporate entity with whom Lowe's has a business relationship. *Pls.' Supplemental Mem.,* Ex. 5. Correspondence concerning the Lowe's Agreement is plainly from the President of Oldcastle APG National, Inc. *Id.* Further, Oldcastle APG National, Inc., is the corporate entity that is cited on other agreements regarding the Lowe's Agreement, including the USA Rebate Agreement, USA Marketing Agreement, and the 2000 Special Promotion and Advertising Program Support Agreement. *Id.*

Plaintiffs maintain that the Phillips's first affidavit "creates more than the necessary inference that [OI] has continuous and systematic contacts with the state of Maryland to satisfy general jurisdiction standards." *Pls.' Reply Mem.* at 3 n.3. I disagree. Phillips's first affidavit is not based upon personal knowledge; it is based only upon her assumption that the Lowe's Agreement was executed on behalf of OI. As discussed *supra*, defendants have established that OI did not authorize anyone to execute this agreement on its behalf. Nor have plaintiffs offered any evidence that would cause me to doubt the affidavits and deposition testimony submitted by OI. Therefore, even viewing the facts in the light most

favorable to plaintiffs, the conclusion is inescapable that OI is not the corporate entity conducting business in Maryland under the Lowe's Agreement.  Plaintiffs fail to provide any evidence creating a factual dispute that OI, a holding company headquartered in Atlanta, entered into contracts to sell goods and products in Maryland.

Plaintiffs also contend that the Lowe's Information Sheet and Vendor Sheet establish that OI maintained offices and a mailing address in Maryland. Plaintiffs rely primarily upon the Lowe's Information Sheet, which lists OI's address as "2630 Conway Road, Crofton, Maryland 21114" and a Vendor Information Sheet showing OI as having a P.O. Box in Maryland.  As explained *supra*, however, these references to OI with respect to the Lowe's Agreement were an error on the part of Mack Schmidt. Moreover, defendants have established that the Conway Road address is for "Balcon," an operating division of Oldcastle APG National, Inc. *Third Hickman Aff.* ¶ 13. Again, plaintiffs have failed to submit any evidence that would cast doubt on Hickman's averments about the entity having the above Maryland address.  *Id.*

Finally, with respect to the Lowe's Agreement, plaintiffs argue, without citation to any authority, that OI is estopped from denying that it has offices or a mailing address in Maryland because OI's representations contained within the Lowe's Information Sheet and the Vendor Sheet. This argument is unavailing, as plaintiffs have utterly failed to establish that an authorized agent of OI made these representations.

In a similar vein, plaintiffs attempt to attribute OI the activity surrounding the May

-10-

13, 1997, Home Depot Agreement ("Home Depot Agreement"). Here again, however, plaintiffs fail to establish the existence of any business relationship between OI and Home Depot in Maryland. Plaintiffs argue that personal jurisdiction may be properly exercised over OI because the Home Depot Agreement cites "Oldcastle/Amcor" as the corporate entity which executed the agreement.[5] *Pls.' Supplemental Mem.* at 7. The Home Depot Agreement, however, does not reveal any connection between OI and Maryland. *Pls.'s Supplemental Mem.*, Ex. 6. The Home Depot Agreement was not executed on behalf of OI; rather, it was executed by Doug Ward, then President of Oldcastle APG West, Inc., and Utah Block Company, and specifically references 333 South Redwood Drive, North Salt Lake, Utah 84054, which is the address of Amcor Masonry Products and Utah Block Company. *Third Hickman Aff.* ¶ 14, 17. Further, Doug Ward is neither a current nor former employee of OI. *Id.* The incorrect reference to "Amcor/Oldcastle" on the Home Depot Agreement does not support the exercise of personal jurisdiction over OI.

Representations in Patent and Trademark Applications

Next, plaintiffs contend that the exercise of personal jurisdiction over OI is appropriate because OI represented, in applications filed with the United States Patent and Trademark Office, that it maintained offices in Maryland and had a mailing address in Maryland. Specifically, plaintiffs allege that OI represented, under oath, that it is "a

---

[5]As discussed *infra*, plaintiffs also rely upon the Home Depot Agreement to support their argument that Amcor's contacts with Maryland should be attributed to Oldcastle, Inc.

corporation of Delaware having a place of business at P.O. Box 3388, Crofton, MD 21114."

*Pls.' Supplemental Mem.*, Ex. 7. Upon close inspection of the trademark application, it is

clear that it was not submitted by OI. The trademark application on which the plaintiffs rely

was signed by Catherine Wack who is not now and has never been employed by OI. *Third*

*Hickman Aff.* ¶ 23.

At the time Wack signed the trademark application, she was serving as Executive Vice

President of Betco South, which was then an operating division of Betco Block & Products,

Inc., in Crofton, Maryland. *Id.* Presently, Wack serves in the same position for the South

Division of Betco Block, which is a division of Oldcastle APG National, Inc., in Manassas,

Virginia. *Id.* Furthermore, as previously stated, OI does not have offices in Maryland. *Id.* at

¶ 7. As reflected in the Trademark Principal Register for Oldcastle® (PTP Reg. No.

2,212,758), *Pls.' Supplemental Mem.*, Ex. 7, OI's principal office is at 375 Northridge Road,

Suite 350, in Atlanta.

Finally, plaintiffs appear to argue that, at a minimum, these facts, when viewed in the

light most favorable to plaintiffs, create an inference that OI maintains and/or recently

maintained an office and a mailing address in Maryland. *Pls.' Supplemental Reply Mem.*, at

2-3 n. 2. No basis for such an "inference" exists, however, as plaintiffs have failed to

establish any facts-- that OI maintained an office in Maryland or ever *represented* that it

maintained an office in Maryland-- that would support such an "inference."[6]

Amcor's Contacts

Plaintiffs maintain that Amcor's contacts with Maryland should be attributed to OI for jurisdictional purposes. *Pls.' Supplemental Mem.* at 6-7. It is entirely unclear, however, upon what authority plaintiffs base this contention. Plaintiffs offer only unsupported allegations concerning OI's conduct.

First, plaintiffs allege that OI made representations to Burns & Russell that OI and Amcor, Inc., were synonymous.[7] *Pls.' Supplemental Mem.*, 6. Plaintiffs, however, provide no citation to the record to support this allegation. *Id.* Plaintiffs also assert, without citation, that OI used "Amcor" as a trade name, i.e., "d/b/a/". OI, to the contrary, contends that APG

---

[6]Although the matter is not free of doubt, plaintiffs also appear to argue, without citation to authority, that OI's promotion of its trademark throughout Maryland is sufficient to justify the exercise of personal jurisdiction over OI. *Pls.' Supplemental Mem.*, 9. There is no dispute that OI's trademark appears on displays in Home Depot and Lowe's stores in Maryland. *McCullough Dep.* at 156-157. OI's trademark and web site address also appear on sales literature provided on racks in Home Depot and Lowe's stores. *Pls.' Supplemental Mem.*, Ex. 23. Plaintiffs fail to offer any authority, however, that such activities warrant the exercise of general personal jurisdiction. *Cf. Ratliff v. Copper Labs., Inc.*, 444 F.2d 745, 748 (4th Cir.) (explaining that "[w]hen ... defendant's only activities consist of advertising and employing salesmen to solicit orders, we think that fairness will not permit a state to assume [general] jurisdiction.") (quotations omitted)), *cert. denied*, 404 U.S. 948 (1971), *rehearing denied*, 404 U.S. 1006 (1971).

[7]OI is not now and has never been Amcor, Inc. OI was legally incorporated on June 26, 1978. *Def. Oldcastle, Inc.'s Responses to Pl. Southeast Capital Corp. Interrogatories*, 5; *McCullough Dep.*, 8-11. OI contends, and plaintiffs do not dispute, that on that very same day, OI entered into an agreement with Amcor, Inc., to acquire certain of Amcor, Inc.'s assets by November 1, 1978. Before the closing of this transaction, Cemston, Inc., was incorporated as a first-tier subsidiary of OI. On or about October 20, 1978, OI, assigned to Cemstone, Inc., its rights to acquire certain assets of Amcor, Inc. On November 1, 1978, Cemstone, Inc., exercised its rights and acquired those assets.

West, Inc., is the successor to Amcor, Inc., and that "Amcor" is a trade name of a Utah-based unincorporated division of Oldcastle APG West, Inc. *Defs.' Supplemental Mem.*, 5-6 n. 4.

Second, plaintiffs rely on directories published by trade associations, which described Amcor as "a division" of OI. *Pls.' Supplemental Mem.*, 7. Defendants contend that the characterization contained within the directories is erroneous and that the trade directories have been corrected. *Defs.' Supplemental Reply*, 6; *McCullough Dep.* at 149-151. Plaintiffs do not appear to dispute that this characterization was indeed inaccurate. Furthermore, plaintiffs provide no authority that incorrect characterizations of corporate structure by third-party trade associations could bind the corporate entities. These inaccurate descriptions, therefore, do not provide any basis for treating Amcor, Inc., and OI as synonymous entities for purposes of personal jurisdiction analysis.

Third, plaintiffs allege that OI executed contracts using the name "Amcor/Oldcastle." *Pls.' Supplemental Mem.*, 7. Plaintiffs cite only the Home Depot contract and, as discussed *supra*, plaintiffs have failed to established that the Home Depot contract was in fact executed by OI.

Finally, plaintiffs observe that Michael Lynch was simultaneously the Chief Financing Officer of Amcor, Inc., and OI from 1979 to 1982. *Pls.' Supplemental Mem.*, 7. Plaintiffs offer no legal argument in support of their contention that this three year overlap more than twenty years ago warrants construing Amcor, Inc. and OI as synonymous for jurisdiction purposes. Clearly, such an association between Amcor, Inc., and OI over twenty years ago

has no baring on the current interactions between Amcor, Inc. and OI.

In sum, plaintiffs have failed to establish a basis for attributing to OI the Maryland contacts of Amcor, Inc. Accordingly, I need not assess whether Amcor's contacts are sufficient for this court to assert personal jurisdiction.[8]

Travel by, and Residence of, OI's Employees

Next, plaintiffs argue that visits to Maryland by OI's personnel are such that this court should exercise general jurisdiction over OI. *Pls.' Supplemental Mem.*, 10. Plaintiffs place great significance on visits to Maryland to supervise and review tax and accounting issues related to Oldcastle APG National, Inc., Precast, Inc., and American Stone Mix, Inc., by Gary Hickman, OI's Vice President of Tax. Plaintiffs also aver that Hickman traveled *through* Maryland to visit OI holdings in Pennsylvania. *Id.* Such contacts, however, do not make OI susceptible to every sort of claim that might be filed in the state of Maryland.

In addition, plaintiffs contend that OI employed two individuals who worked in Washington, D.C., and lived in Maryland-- Suzanne Kelley and Mark Towe. *Pls.' Supplemental Mem.*, 11. Plaintiffs fail to explain how the fact that two of its District of Columbia employees happen to live in Maryland would subject OI to general jurisdiction in Maryland. Moreover, it does not even appear that these individuals are employed by OI, as

---

[8]Plaintiffs detail Amcor's contacts with Maryland in their May 25, 2001, opposition to defendants motion to dismiss. *Pls.' Op. to Defs.' Mot. to Dismiss*, 15-16. In this prior memorandum, plaintiffs describe the corporate entity as Oldcastle, Inc. t/a Amcor or Oldcastle, Inc. d/b/a Amcor. Plaintiffs, however, failed to provide support for this characterization of Oldcastle, Inc. *Id.*

the salary expenses incurred by OI for these employees are charged back to Oldcastle

Materials, Inc., *id.* at 79, and both Mark Towe and Suzanne Kelly work full-time in the

Washington, D.C. offices of Oldcastle Materials, Inc. *Hickman Dep.*, 75-77.

*Specific Jurisdiction*

Plaintiffs' arguments for the existence of specific jurisdiction do not satisfy statutory

or constitutional requirements any more than their arguments in favor of general jurisdiction.

Plaintiffs contend that their lawsuit arises out of OI's activities in Maryland. Specifically,

plaintiffs cite OI's promotion of products sold by Trenwyth Industries in Maryland, *Pls.'*

*Reply Mem.*, 5; and "Oldcastle, Inc.'s ongoing contacts on behalf of Amcor regarding the

Trenwyth acquisition." *Id.* 5. The facts fall far short of the rhetoric.

With regard to OI's alleged promotion of Trenwyth Industries' products, plaintiffs

argue that these actions were in violation of the Trenwyth Settlement Agreement. *See Second*

*Amended Complaint, Count III.* Specifically, plaintiffs contend that OI promoted these

products by placing advertisements in the "Sweets Catalog," an architectural reference book

distributed throughout Maryland. *McCullough Dep.* at 120. It appears, however, that Mack

Schmidt, on behalf of Oldcastle Architectural Products, Inc., arranged to have its products

included in the Sweets Catalog. *Id.* at 122. There is no support in the record evidencing OI's

involvement in this promotion effort.

Plaintiffs argue that OI's involvement is evidenced by its address on the last page--

375 Northridge Road, Suite 350 Atlanta, Georgia 30350. McCullough explained, though, that

the address listed was the address for Architectural Products Group from 1994-1995. *Id.* at 124-25. McCullough clarified that there are two offices at this address, one for OI and one for Architectural Products Group. McCullough testified that the two entities are in separate offices and separate floors. *Id.* Therefore, this alleged contact of Oldcastle Architectural Products Group is not sufficient to create specific jurisdiction over OI.

Visits by Joseph McCullough

Plaintiffs assert that McCullough visited their offices in Baltimore to resolve conflicts that resulted from the "Oldcastle" acquisition of Trenwyth Industries. McCullough admitted that he visited plaintiffs in Baltimore in late 1997 or early 1998. *McCullough Dep.* at 93. According to McCullough, the purpose of these meetings was to assure plaintiffs that "Oldcastle [would] be of whatever help . . . to transfer the license that was owned by Amcor and make sure that there was no conflicts between the two companies." *Id.* at 94. Plaintiffs contend that McCullough's presence during these visits was as an employee of OI. Plaintiffs cite McCullough's business card as establishing that he held himself out to be an employee of OI and they rely on the fact that McCullough received his paycheck from OI.

McCullough testified, however, that at this meeting, he was working for Oldcastle Architectural Products Group. *Id.* at 98. While the business card does list the Atlanta address of OI in smaller font, the card clearly describes McCullough as the president of Architectural Products Group. *Pls.' Supplemental Mem.*, 3, Ex. 8. According to McCullough, Architectural Products Group and Oldcastle Architectural, Inc., are the same. *McCullough Dep.*, 75.

McCullough also testified that he has not been employed by OI since 1987 and his first involvement with plaintiffs did not occur until late 1997 or early 1998. *Dep. McCullough*, 12. Plaintiffs do not appear to dispute this. Indeed, in the right hand corner and in the largest font, the card states "Oldcastle' Architectural." *Id.*[9] At most, McCullough's business card was unclear. The reference to OI on the business card does not by itself establish actual contact by OI. Furthermore, even if plaintiffs had established that McCullough indeed was employed by OI, plaintiffs have failed to demonstrate how their claims arose from this transaction.

Plaintiffs also rely upon McCullough's visits to Baltimore to pursue the acquisition of plaintiffs. Plaintiffs contend that these visits are at issue in this case because they are part of OI's "interest in achieving greater control over the glazed block industry." *Pls.' Reply*, 3. Specifically, plaintiffs contend that McCullough was interested in acquiring the underlying rights to plaintiffs' existing licensing agreement. *Rich Aff.* , ¶24; *Rich Second Aff.*, ¶¶2,5. According to Rich, the acquisition of Burns & Russell was under consideration as a potential method for resolving conflicts created by the Trenwyth acquisition. *Rich Second Aff.*, ¶¶ 2,6.

The argument concerning McCullough's visits fares no better, as plaintiffs have failed to establish that McCullough was acting on behalf of OI. As stated *supra*, McCullough testified that he has not been employed by OI since 1987 and his first involvement with

---

[9]Defendants deny the genuineness of the business card. Response to Request for Genuineness No. 19, Pls.' Reply, Ex. 22. At deposition, McCullough apparently pulled out the same business card. He stated he had grabbed that card by mistake. *McCullough Dep.* at 82-83.

Burns & Russell occurred in late 1997 or early 1998. *Dep. McCullough*, 12. Therefore, it is
not clear how McCullough's business travel to the state of Maryland in 1997 can be
attributed to OI for jurisdictional purposes. McCullough further testified that at "[n]o time
did I ever represent myself as president of [OI]." *McCullough Dep.*, 102.

Relying for the most part on the Second Affidavit of Russell Rich, the President of
Burns & Russell, plaintiffs cite various meetings involving Burns & Russell with other
individuals allegedly employed by OI. Plaintiffs fail, however, to establish that any of these
individuals were employed by OI at the time of the contacts. Plaintiffs cite to actions by
Doug Ward, who, according to plaintiffs, "helped set up the Baltimore meeting" between
Rich and McCullough. Doug Ward, however, is not a current or former employee of OI.
*Third Aff. Hickman*, ¶14. Doug Ward previously served as the President of Oldcastle APG
West, Inc. and Utah Block Company, located in Utah. *Id.* Next, plaintiffs cite contacts by
Tim Friedel, whom plaintiffs allege was "a senior Oldcastle, Inc. executive." Again, plaintiffs
fail to establish that Friedel has ever been employed by OI. *See Third Hickman Aff.*, ¶16. As
reflected in correspondence, Friedel was previously employed by Oldcastle Architectural,
Inc. *Third Hickman Aff.*, ¶16.[10] Plaintiffs also rely on the contacts by Mack Schmidt. Again,
however, Schmidt is not a current or former employee of OI. *Third Hickman Aff.*, ¶15.
McCullough testified that Schmidt previously served as President of Westile, and that later
he served as president of the Home Center Group, at the time a division of Oldcastle

---

[10]The stationary refers to Oldcastle, Inc., in a footer at the bottom of the page.

-19-

Architectural, Inc. *McCullough Dep.* 113-114; *Kiley Aff.*, 3. Finally, plaintiffs place significance on a visit by Liam O'Mahoney, the prior president of Oldcastle, Inc., who visited Burns & Russell in 1989 in connection with the Amcor/Oldcastle know-how and trademark licenses. Plaintiffs do not show how such a contact is sufficient to establish this court's specific jurisdiction over OI.

In sum, plaintiffs' evidence of meetings between Rich and employees and principals of corporate entities other than OI does not support this court's exercise of personal jurisdiction over OI. Moreover, it remains a mystery as to how the above contacts would satisfy specific personal jurisdiction, as plaintiffs' arguments are based on the premise that the current litigation arises out of a "business relationship between Burns & Russell and Oldcastle, Inc." *Pls.' Reply*, 4. The record does not support the existence of such a business relationship.

*Jurisdiction Based upon Acts of Subsidiaries*

As explained *supra*, OI cannot be subjected to jurisdiction in Maryland based on its own activity through its duly authorized agents. Plaintiffs argue that jurisdiction is nevertheless proper because jurisdiction can be based upon the actions of OI's corporate subsidiaries.

To assert jurisdiction over a parent company based on the conduct of a subsidiary, the court must find circumstances warranting it to "pierce the corporate veil." Forum state law determines whether the corporate veil should be pierced to establish personal jurisdiction

over a nonresident defendant. *Mylan Labs, Inc. v. Akzo, N.V.,* 2 F.3d 56, 61 (4th Cir. 1993).

The Court of Appeals of Maryland has adopted the so-called "agency" test in deciding whether to "pierce the veil" separating parent corporations from their subsidiaries for jurisdictional purposes. *Id.* (citing *Vitro Elec. v. Milgray Elec., Inc.,* 58 A.2d 749, 751-52 (Md. 1969)). This test allows a court to attribute the actions of a subsidiary corporation to the foreign parent corporation only if the parent exerts considerable control over the activities of the subsidiary. *Id.* Factors central to the determination of whether "considerable control" exists-- and thus whether the corporate veil may be pierced-- include (1) "whether significant decisions of the subsidiary must be approved by the parent"; (2) "whether the parent and the subsidiary maintain separate books and records, employ separate accounting procedures, and hold separate directors' meetings"; and (3) "the level of interdependence between parent and subsidiary." *Id.*

Here, plaintiffs present multiple arguments for "piercing the corporate veil" of OI. Despite these arguments, plaintiffs have failed to meet their burden of proving that the significant decisions of defendants' subsidiaries, which transact business in Maryland, are subject to the approval of OI. Plaintiffs assert that the corporate boundaries should be ignored because "the banking, tax filing, insurance functions and all subsidiaries are centralized under Oldcastle, Inc." *Pls. ' Supplemental Mem,* 12. Plaintiffs begin by contending that OI exerts "control" over all "insurance functions" for its subsidiaries. *Pls. ' Supplemental Mem.,* 12-13. On deposition, though, Hickman testified that insurance services are obtained

through the efforts of an independent consultant and are purchased by an off-shore insurance "captive" of CRH, plc, the parent holding company, in Ireland. *Hickman Dep.*, 72-73. Plaintiffs next cite to the cash lending services provided to the subsidiaries. *Pls.' Supplemental Mem.,* 12. These services are not provided by OI, however, but by CRH America, Inc.-- a fourth-tier subsidiary of OI. *Hickman Dep.*, 40-41. These lending services offered by a fourth-tier subsidiary do not establish the "substantial control" by OI upon which plaintiffs must rely on which to base their personal jurisdiction arguments. Plaintiffs cite also to miscellaneous activities of OI, such as preparation of tax returns for its subsidiaries, coordination of a leasing program with outside vendors to obtain preferred rates for car rentals by combining the purchasing power of several companies; and the fact that OI charged a "management fee" to its various subsidiaries. *Pls.' Reply*, 10. Such activities are insufficient to warrant piercing the corporate veil where OI exists as a separate corporate entity, maintains its own records, and exists for a distinct purpose.

### (iv)

Still outstanding in this case are the motions of OPI and OI to dismiss for failure to state a claim. Resolution of the personal jurisdiction issues has rendered OI's motion moot. I turn now to OPI's motion to dismiss for failure to state a claim.

Apparently, plaintiffs joined OPI as a defendant in this case because plaintiffs theorized that OPI is liable as the successor to Amcor, Inc. *Pls.' Op. to OPI's Motion to Dismiss*, at 3 (alleging that OPI was "the true identity of the Oldcastle entity liable for [Burns

& Russell's] contracts with Amcor, Inc.").[11] Although plaintiffs have sued OPI as the successor to Amcor, Inc., for myriad claims ranging from breach of fiduciary duty to monopolization under the Sherman Act, the amended complaint contains only one allegation regarding OPI, namely:

> Oldcastle, Inc. in or about 1978, secretly created . . . Oldcastle Precast, Inc., a Washington corporation with its principal place of business in Auburn, Washington . . . as [an] alter ego [] and continuation[] of Oldcastle, Inc. created as a sham to escape the liabilities of Amcor, Inc. and its own liabilities to Burns & Russell.

*First Amended Complaint*, ¶5. Plaintiffs' muddled "allegation" against OPI falls far short of the requirements of Fed. R. Civ. P. 8(a) to set forth a "short and plain statement" of a claim. Consequently, I shall dismiss all claims as to OPI.

(v)

For the reasons set forth, I shall grant OI's motion to dismiss for lack of personal jurisdiction and OPI's motion to dismiss for failure to state a claim. An Order follows.

Filed: May 2, 2002

ANDRÉ M. DAVIS
United States District Judge

---

[11]In the second case, on January 16, 2002, plaintiffs voluntarily dismissed all claims against Amcor, Inc., because defendants assured plaintiffs that APG West, Inc., is the proper party with respect to the "1980 Know-How Agreement." Thus, I infer that it is agreed that APG West, Inc., is the agreed successor to Amcor for all purposes.